UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

UNITED STATES OF AMERICA,

    -  against  -

                                  **MEMORANDUM & ORDER**

EMMANUEL ASUQUO OKON,              19-CR-492 (MKB)

                        Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On October 24, 2019, a grand jury returned an indictment against Defendants Quincy

Thorpe and Emmanuel Asuquo Okon, charging them with conspiracy to steal cargo in violation

of 18 U.S.C. §§ 659, 371, and 3551 *et seq.* ("Count One"), and stealing cargo in violation of 18

U.S.C. §§ 659, 2, and 3551 *et seq.* ("Count Two").  (Indictment ¶¶ 1–3, Docket Entry No. 7.)

The Indictment alleges that Okon and Thorpe, together with others, conspired to steal, and stole,

a bag "containing United States and foreign currency of approximately $258,205."  (*Id.*)

On March 17, 2021, Okon moved pursuant to the Fourth Amendment of the U.S.

Constitution to suppress the fruits of a search conducted on September 29, 2019, of a blue Nissan

Sentra belonging to Okon's domestic partner, Sergeant Ayanna Giddens.[1]  Okon also seeks the

immediate production of all exculpatory and impeachment material.  (*Id.*)  The Government

opposes the motion.[2]  For the reasons set forth below, the Court denies Okon's motion.

**I.  Background**

The Indictment charges that, on or about September 24, 2019, Okon and others

---

[1]  (Def.'s Mot. to Suppress ("Def.'s Mot."), Docket Entry No. 38; Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Mem."), annexed to Def.'s Mot., Docket Entry No. 38.)

[2]  (Gov't Opp'n to Def.'s Mot. ("Gov't Opp'n"), Docket Entry No. 40.)

intentionally and unlawfully "[took] and carried away" from John F. Kennedy ("JFK")

International Airport "a stolen bag containing United States and foreign currency of

approximately $258,205 in value, which . . . constituted an interstate shipment of freight, express

and other property, with intent to convert said goods and chattels to their own use." (Indictment

¶ 3.) Okon is charged in Count One of the Indictment with conspiracy to steal cargo, and in

Count Two of the Indictment with stealing cargo. (*See id.* ¶¶ 1–3.) The Indictment alleges that

Okon drove "the car containing the stolen bag and its contents away from JFK Airport." (*Id.* ¶

2(d)). Security surveillance showed that the vehicle was "a blue Nissan Sentra," and a witness

identified the Nissan Sentra driver as Okon. (Gov't Opp'n 3.) Okon's domestic partner,

Sergeant Giddens, owned a blue Nissan Sentra. (Aff. of Sergeant Giddens ("Giddens Aff.") ¶ 4,

annexed to Def.'s Mot., Docket Entry No. 38.)

Sergeant Giddens was a New York City Police Department ("NYPD") officer with

twenty-six years of experience. (Tr. of Criminal Cause for Suppression Hearing dated Dec. 9,

2021 ("Tr."), at 126:13–15, Docket Entry No. 50.) On September 24, 2019, the date of the

alleged theft of funds, Sergeant Giddens was not in the United States. (Giddens Aff. ¶ 5.) Upon

her return on September 29, 2019, at JFK Airport, Federal Bureau of Investigations ("FBI")

Special Agents Robert Carasiti and Regina Lau introduced themselves and asked to speak to her

about a cargo theft at the airport. (Tr. 127:13–17, 148:7–14.) The FBI agents advised Sergeant

Giddens that they knew she was out of the country at the time of the incident and that she was

not a suspect. (Tr. 148:21–25.) Special Agent Carasiti explained that Sergeant Giddens was not

being detained and was free to go and asked whether she would voluntarily answer some

questions. (Decl. of Special Agent Carasiti ("Carasiti Decl.") ¶ 7, annexed to Gov't Opp'n,

Docket Entry No. 40-2.) Sergeant Giddens was cooperative and agreed to speak to the agents.

(*Id.*; Giddens Aff. ¶ 11 ("At no time was I ever told that I was under arrest or charged with any crime.").)  In response to a question by Special Agent Carasiti about the location of her blue Nissan Sentra, Sergeant Giddens answered that because she had been out of the country, she did not know, (Carasiti Decl. ¶ 9), but she was aware of the theft that the agents were investigating, (*id.* ¶ 8).  Sergeant Giddens' demeanor during the interview was casual, and she agreed that the FBI agents could contact her in the future for any further questions.  (*Id.* ¶¶ 10–11.)

After the FBI agents left the room, two officers from the NYPD Internal Affairs Bureau ("IAB"), Lieutenant Mobeen Yasin and Sergeant Konstantin Klebenov, met Sergeant Giddens to place her on modified duty.[3]  (Tr. 132:8–10; Decl. of Lieutenant Yasin ("Yasin Decl.") ¶¶ 1, 5, 11, annexed to Gov't Opp'n, Docket Entry No. 40-1.)  Sergeant Giddens then left JFK with the IAB officers to drop off her luggage and retrieve her firearms from her home.  (Tr. 133:8–18.)  Lieutenant Yasin stated that the IAB agents asked Sergeant Giddens to retrieve the firearms with them and that "she did so willingly."  (Yasin Decl. ¶ 12.)  Sergeant Giddens stated that she was not free to leave the custody of the IAB agents and that the IAB agents never told her she was free to leave.  (Tr. 134:12–17.)

That same night, FBI agents found Sergeant Giddens' blue Nissan Sentra parked on a public street in Queens, New York.  (Carasiti Decl. ¶ 13.)  The vehicle was locked with no passengers inside.  (*Id.*)  The FBI agents confirmed that it was Sergeant Giddens' vehicle and, "[t]hrough the windows," Special Agent Carasiti "saw a gallon bottle of water on top of a manila

---

[3]  According to the Patrol Guide, the purpose of modified duty is "[t]o assign a uniformed member of the service to non-enforcement duties pending determination of fitness to perform police duties."  New York City Police Department, *Procedure No. 206-10 Modified Assignment*, Patrol Guide (Sept. 27, 2016), http://www.nyc.gov/html/nypd/downloads/pdf/public_information/public-pguide1.pdf.  On modified duty, NYPD officers are relieved of their firearms, shield, identification card, and other NYPD property, and temporarily reassigned to non-enforcement roles.  *Id.*

envelope." (*Id.*)  Special Agent Carasiti called Lieutenant Yasin and spoke with Sergeant

Giddens.[4]  (Carasiti Decl. ¶ 14; Yasin Decl. ¶ 13; Tr. 135:23–136:7.)  Special Agent Carasiti

explained to Sergeant Giddens that the FBI had found her Nissan Sentra and asked for her

consent to search the car.  (Tr. 136:10–20; Yasin Decl. ¶ 14; Carasiti Decl. ¶ 14.)  Special Agent

Carasiti testified that Sergeant Giddens said, "well, you're only going to impound the car if I say

'no,' so 'yes.'"  (Yasin Decl. ¶ 14; Carasiti Decl. ¶ 14.)  After Sergeant Giddens provided

consent, she agreed to search for her car keys and provide them to the FBI.  (Tr. 136:16–20,

159:12–18, 161:17–19.)

       Sergeant Giddens stated in her affidavit that because she felt her job, livelihood, and

youngest child's future was at stake, she felt that she "had no choice but to give them the keys

and consent to the search."  (Giddens Aff. ¶ 14.)  Sergeant Giddens did not express to the agents

that she thought she could be suspended or fired if she declined to provide consent.  (Tr. 161:11–

16.)

       After Sergeant Giddens' conversation with Special Agent Carasiti, the IAB officers drove

Sergeant Giddens back to her home, but Sergeant Giddens was unable to locate the car keys.

(Tr. 137:18–22, 163:19–22.)  When Special Agent Carasiti called a second time, Sergeant

Giddens told Special Agent Carasiti that she could not find her car keys.  (Carasiti Decl. ¶ 16; Tr.

163:19–164:5.)  Special Agent Carasiti then told Sergeant Giddens that Emergency Services Unit

("ESU") was on site and that the FBI "could have the car opened and would try not to damage it,

as long as she still consented," and again asked for her consent to search the car.  (Carasiti Decl.

¶ 16; Tr. 138:5–7, 164:2–5, 164:13–165:3.)  Special Agent Carasiti testified that Sergeant

---

[4]  At the time of the call, Lieutenant Yasin was riding with Sergeant Giddens on their way
the 77th Precinct to retrieve two of her work firearms that were stored there.  (Tr. 134:12–
135:13.)

Giddens agreed and stated that she did not want to lose use of the car.  (Carasiti Decl. ¶ 16.)  At no time did any FBI agent or IAB officer inform Sergeant Giddens that she was not free to leave. (Yasin Decl. ¶ 16.)  Sergeant Giddens stated that the FBI informed her that "if [she] didn't consent to them breaking into the vehicle without the keys they would seize [her] car," and she felt that she "had no choice but to do what they wanted" because her job, livelihood, and youngest child's future were at stake.  (Giddens Aff. ¶¶ 16, 18.)  Special Agent Carasiti denied threatening Sergeant Giddens with "any negative repercussions to her whatsoever should she have chosen not . . . to consent to a search of her car," (Carasiti Decl. ¶ 17), and Lieutenant Yasin did not recall hearing Special Agent Carasiti making such a threat, (Yasin Decl. ¶ 15).

That evening, the FBI gained access to the blue Nissan Sentra and a search of the vehicle yielded a manila envelope on the floor of the car, which contained a Delta Airlines Cargo Air Waybill for Delta Flight 1226 and receipts from Loomis International, the security company from which the cargo was stolen.  (Carasiti Decl. ¶ 19.)

**II.   Discussion**

    **a.   Standard of review**

"On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure," *United States v. Davis*, 111 F. Supp. 3d 323, 331 (E.D.N.Y. 2015) (quoting *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014)), and that the defendant "had a reasonable expectation of privacy in the place or object searched," *United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017).  Once the defendant has shown a basis for his motion, the burden shifts to the government to demonstrate that the search or seizure did not violate the Fourth Amendment.  *Id.* (collecting cases); *see also United States v. Chandler*, 164 F. Supp. 3d 368, 376 (E.D.N.Y. 2016) ("[O]nce

the Defendant shows that the [g]overnment official was acting without a warrant, 'the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement' of the Fourth Amendment." (*quoting United States v. Perea*, 986 F.2d 633, 639 (2d Cir.1993))).

### b.   The Court denies Okon's motion to suppress

Okon argues that fruits of the search of Sergeant Giddens' vehicle should be suppressed because Sergeant Giddens' consent was not voluntary.  (Def.'s Mem. 6–7; Def.'s Post-Hearing Letter Brief ("Def.'s Letter"), Docket Entry No. 51.)  In support, Okon contends that Sergeant Giddens was not advised that she could refuse to consent and that consent was obtained upon the threat to her employment.  (Def.'s Mem. 7; Def.'s Letter.)

The Government argues that Sergeant Giddens voluntarily consented to the search. (Gov't Opp'n 10; Gov't Post-Hearing Letter Brief ("Gov't Letter") 4, Docket Entry No. 49; Gov't Post-Hearing Letter Reply ("Gov't Reply") 1, Docket Entry No. 52.)  In support, the Government argues that (1) Sergeant Giddens' experience as a twenty-six year veteran of the NYPD establishes her knowledge of her right to decline to consent to a search, (Gov't Opp'n 11); (2) Sergeant Giddens was never in custody or threatened and was cooperative throughout her interactions with the FBI and IAB, (*id.* at 12); and (3) the evidence inevitably would have been discovered by lawful means, (Gov't Letter 6).

Officers may effectuate a search and seizure of property without violating the Fourth Amendment if they have "obtained the voluntary consent of a person authorized to grant such consent" *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018); *see United States v. Gomez*, 877 F.3d 76, 98 (2d Cir. 2017) ("It is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted

pursuant to consent.'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973))); *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996) ("[O]fficers may search property without violating the Fourth Amendment if the owner or lawful custodian voluntarily gives consent."). Determination of whether consent was voluntarily given "requires a fact-based inquiry that considers the 'totality of all the circumstances.'" *Iverson*, 897 F.3d at 458 (quoting *Schneckloth*, 412 U.S. at 227); *see United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) ("We employ an objective test in deciding whether an exigency justified a warrantless intrusion on Fourth Amendment interests, one 'that turns on [an] examination of the totality of circumstances confronting law enforcement agents in the particular case.'" (alteration in original) (quoting *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990))); *United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993) ("Whether an individual has consented to a search is a question of fact to be determined by the 'totality of all the circumstances.'" (quoting *Schneckloth*, 412 U.S. at 227)). "[T]he consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Kaminsky v. Schriro*, 760 F. App'x 69, 72 (2d Cir. 2019) (citing *Iverson*, 897 F.3d at 458); *see United States v. Vega*, No. 20-4135, 2021 WL 6116823, at *2 (2d Cir. Dec. 27, 2021) (same).

In assessing voluntariness, district courts are to bear in mind the "totality of all the circumstances," *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (quoting *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004)), including "both the characteristics of the accused and the details of the interrogation," *Schneckloth*, 412 U.S. at 226; *see United States v. Juv. Male*, 968 F. Supp. 2d 490, 513 (E.D.N.Y. 2013) ("In assessing the 'totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation' — the Supreme Court has considered various factors." (quoting *Schneckloth*, 412

U.S. at 226). "In examining all the surrounding circumstances . . . , account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 487 (E.D.N.Y. 2018) (quoting *Corbett v. City of New York*, No. 15-CV-09214, 2017 WL 3207783, at *9 (S.D.N.Y. July 27, 2017)), *as amended* (June 27, 2018). Among the nonexclusive factors the court may consider are "the youth of the [consenting person], his lack of education, or his low intelligence, the lack of any advice to the [consenting person] of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, . . . whether the [consenting person] was in custody and in handcuffs, whether there was a show of force, whether the [government] agents told the [consenting person] that a search warrant would be obtained, whether the [consenting person] had knowledge of the right to refuse consent, and whether the [consenting person] previously had refused to consent." *United States v. Schaefer*, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012) (first quoting *Schneckloth*, 412 U.S. at 226; and then quoting *United States v. Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y.1998)); *United States v. Garcia*, 554 F. Supp. 3d 421, 429 (E.D.N.Y. 2021), *appeal withdrawn*, No. 21-2153, 2021 WL 7367169 (2d Cir. Dec. 7, 2021). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Isiofia*, 370 F.3d at 231 (alteration in original) (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995)); *see Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

The "government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (quoting *Isiofia*, 370 F.3d at 230–31); *see also Snype*, 441 F.3d at 131 ("[W]hen, as in this case, the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary.").

Based on the totality of the circumstances, the Court finds that Sergeant Giddens voluntarily consented to the search of the blue Nissan.

First, in addition to the fact that "custody alone has never been enough in itself to demonstrate a coerced confession or consent to search," *United States v. Watson*, 423 U.S. 411, 424 (1976), Sergeant Giddens was not in custody when she consented to the FBI agents' request to search her vehicle. *See United States v. O'Brien*, 926 F.3d 57, 75–77 (2d Cir. 2019) ("[T]he fact that consent was given by the subject of the search while he was in custody does not change the test; custody is a factor to be considered, but not one that is dispositive." (citing *Watson*, 423 U.S. at 424)). Neither the FBI nor the IAB detained Sergeant Giddens, told her that she could not leave, handcuffed her at any time, or placed her in a closed room during interviews. Indeed, Sergeant Giddens admits that she was never told by the FBI that she was under arrest or charged with a crime. (*See* Carasiti Decl. ¶ 7; Yasin Decl. ¶ 16; Giddens Aff. ¶ 11 ("At no time was I ever told that I was under arrest or charged with any crime.").) To the contrary, the FBI agents specifically told Sergeant Giddens that she "was not being detained and was free to go." (Carasiti Decl. ¶ 7; *see also id.* ("We asked if, nonetheless, she would voluntarily answer some questions. Sergeants Giddens was cooperative and agreed to speak with us.") During the December 9, 2021 suppression hearing, Sergeant Giddens testified as follows:

> Q:    And did [the IAB agents] — they didn't tell you you were in custody; did they?

A:      They didn't tell me I was in custody but . . .

Q:      They didn't tell you were —

A:      Not —

. . .

Q:      They didn't tell you that you were under arrest; did they?

A:      No.

(Tr. 151:24–152:9.)  This record does not support Okon's assertion that Sergeant Giddens'

consent "was obtained in submission to a claim of lawful authority."  (Def.'s Letter 2.)  Although

Sergeant Giddens stated in her affidavit that she was "held against [her] will for over five (5)

hours with agents from Customs, FBI and IAB," (Giddens Aff. ¶ 17), this is contradicted by her

own testimony at the suppression hearing, (*see* Tr. 130:9–11 (stating that the FBI agents did not

indicate she was under arrest); Tr. 148:1–2 (stating that the Customs agents did not place her

under arrest); Tr. 148:21–149:4 (stating that the FBI agents told her she was not a suspect, did

not arrest her, and did not accuse her of a crime); Tr. 151:24–152:9 (stating that the IAB agents

did not indicate that she was in custody or under arrest).)  The fact that Sergeant Giddens was

never in custody weighs in favor of a finding that Sergeant Giddens' consent to search was

voluntary.  *See United States v. Clark*, No. 19-CR-155, 2022 WL 1210478, at *10–13 (W.D.N.Y.

Apr. 25, 2022) (finding that the defendant was not in custody when she consented to search

because she was not formally arrested, was advised she could leave, was not restrained, and was

not threatened); *United States v. Scanlon*, No. 15-CR-142, 2017 WL 9485698, at *6 (W.D.N.Y.

Aug. 10, 2017) (finding that the person who consented to a search for firearms was not in

custody based on her conversation with the officer and the fact that she was not in handcuffs and

was not harassed, coerced, or abused), *report and recommendation adopted*, 2017 WL 6001268

(W.D.N.Y. Dec. 4, 2017); *United States v. Derverger*, No. 07-CR-147, 2008 WL 819040, at *6

(N.D.N.Y. Mar. 24, 2008) (finding that the defendant was not in custody when he consented to

search because the officers "neither arrested nor handcuffed defendant, and at no time did they

brandish weapons or intimidate or threaten defendant"), *aff'd*, 337 F. App'x 34 (2d Cir. 2009);

*United States v. Zaleski*, 559 F. Supp. 2d 178, 186–87 (D. Conn. 2008) (finding that, where the

defendant "voluntarily agreed to go" speak with a government agent and was in a police vehicle

"that he could not exit," "even if [the defendant] had been seized within the meaning of the

Fourth Amendment," the circumstances did not render his consent involuntary because the

defendant "was not handcuffed prior to giving consent" and the "police officers did not draw

their guns," "nor did they make any threats or use physical force," and the defendant "was

allowed to walk around more or less freely when he was not in the police car").

Second, Okon's argument under *Garrity v. New Jersey*, that Sergeant Giddens was given

a coercive choice between consent and loss of employment, is unpersuasive.  (Def.'s Letter 2);

385 U.S. 493 (1967).[5]  Neither the FBI nor the IAB explicitly or implicitly threatened Sergeant

Giddens with termination of her employment, and Sergeant Giddens faced only modified

assignment, which is a standard practice within the NYPD.  *See United States v. Price*, 599 F.2d

494, 503 (2d Cir. 1979) (holding that consent to search was voluntary where "[t]he tone of the

questioning was conversational," and "no threats were made in order to obtain [the defendant's]

consent"); *United States v. Faruolo*, 506 F.2d 490, 493 (2d Cir. 1974) (holding that consent to

search was voluntary despite the defendant's alleged concern that officers would arrest his son

---

[5]  In *Garrity*, a group of police officers were investigated by the New Jersey Attorney General concerning an allegation of fixing traffic tickets.  Prior to questioning by the Attorney General's office, each suspect officer was given the following warning: "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office."  *Garrity v. New Jersey*, 385 U.S. 493, 494 (1967).  The officers answered questions, and some of their answers were used in subsequent prosecutions that led to conviction.  The Supreme Court held that because the officers were given the choice between self-incrimination and job forfeiture, pressure was exerted on the officers so "as to disable [them] from making a free and rational choice," and thus rendering their answers involuntary and inadmissible.  *Id.* at 497–98.

because FBI agents "did not state that [the defendant's] wife or son would be prevented from leaving the house" nor "threaten that either wife or son would or could be arrested"); *United States v. Zahrey*, 963 F. Supp. 1273, 1283 (E.D.N.Y. 1997) (holding that, unlike *Garrity*, the officer defendant "simply was not given a choice between his continued employment by the [p]olice [d]epartment and self-incrimination" and "was subjected only to a departmental procedure, known as modification, whereby his badge and guns were removed and he was placed on modified assignment"); *cf. Isiofia*, 370 F.3d at 232–33 (2d Cir. 2004) (holding that consent to search was involuntary where the defendant was "handcuffed to a table for over thirty minutes in the presence of numerous law enforcement agents, some of whom extracted detailed personal and financial information from him," "'yelled' at him using 'abusive language,'" and "told him 'that if [he] did not provide [his] consent, [he] would be jailed and deported and would never see [his] family again'" (alterations in original)).

When the IAB officers placed Sergeant Giddens on modified duty assignment, she never expressed any concerns about potential termination of her employment nor did she demand an attorney or union representative. (*See* Yasin Decl. ¶ 16.) If Sergeant Giddens harbored any concerns regarding her job, they were never communicated to any law enforcement agent nor made readily apparent. (*Id.* ¶ 12; Carasiti Decl. ¶¶ 8, 10, 14 ("Sergeant Giddens was cooperative and answered all of our questions without hesitation.")); *see Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (holding that "determination of consent to enter must 'be judged against an objective standard'" (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968))); *United States v. Colon-Gentile*, No. 12-CR-777, 2014 WL 2157541, at *5 (E.D.N.Y. May 23, 2014) (holding that any concerns the defendant may have had "do not render his consent involuntary because they were never communicated by him to the agents, nor were they readily apparent." (first citing *Isiofia*, 370

F.3d at 231; and then citing *Jimeno*, 500 U.S. at 251)).  Furthermore, placement on modified

duty itself is a common occurrence, and "[u]niformed members of the service are placed on

modified assignment for a number of reasons."  New York City Police Department, *Procedure*

*No. 206-10 Modified Assignment*, Patrol Guide (Sept. 27, 2016),

http://www.nyc.gov/html/nypd/downloads/pdf/public_information/public-pguide1.pdf.  Indeed,

"[t]he vast majority of these members will be restored to full duty and continue to have

successful careers with the [NYPD]."  *Id.*  The record also does not contain any evidence to

suggest that the FBI has any power or authority over Sergeant Giddens and her employment with

the NYPD.  The lack of any indication in the record that Sergeant Giddens had to choose

between consent and employment weighs in favor of a finding that Sergeant Giddens' consent to

search was voluntary.

Third, Okon's assertion that Special Agent Carasiti informed Sergeant Giddens that her

vehicle would be seized if she refused to consent to a search carries little weight in view of the

fact that Sergeant Giddens had already consented to the search of her car prior to this alleged

statement.  (Def.'s Letter 2.)  At the time that Special Agent Carasiti explained to Sergeant

Giddens, during their second phone call, that the FBI would be able to access her vehicle without

her keys, Sergeant Giddens had already consented to a search of her vehicle during their first

phone call.  (*See* Tr. 158:22–159:11 (Sergeant Giddens consenting to search during first call);

163:15–165:3 (Sergeant Giddens consenting to ESU entry during second call).)  In fact, Okon

alleges that Special Agent Carasiti threatened to seize the vehicle as Sergeant Giddens was on

her way to retrieve the keys to the vehicle having already consented to the search during their

first phone call.  (*See* Tr. 159:12–18; 163:15–165:3.)  Since Sergeant Giddens had previously

consented — and because there is no evidence on the record that she ever withdrew consent —

the FBI did not require further consent to search the vehicle.  *United States v. Powers*, 432 F.

App'x 16, 18 (2d Cir. 2011) (holding that consent to search was proper where the individual who

provided consent never withdrew that consent).

Fourth, although Sergeant Giddens was never informed of her right to refuse consent to

the FBI's request to search her vehicle, Sergeant Giddens' extensive law enforcement experience

as a twenty-six year veteran of the NYPD and her supervisory rank of Sergeant at the time of the

incident supports an inference that she was fully knowledgeable of her right to refuse, (*see* Tr.

126:14–15), in particular because she has experience obtaining consent to search as a police

officer and has been present when individuals have declined to consent to searches, (*see* Tr.

144:23–145:15); *Price*, 599 F.2d at 503 (holding that consent to search was voluntary because, in

part, "[the consenting person] has also had previous experience with the criminal law and thus is

not a stranger to police techniques").[6]  Thus, the fact that Sergeant Giddens was not explicitly

informed of the right to refuse consent, or to withdraw her earlier consent, carries little weight

_____

[6]  Courts in this Circuit have also noted that knowledge of the right to refuse is not a
requirement to a voluntariness determination.  *Kaminsky v. Schriro*, 243 F. Supp. 3d 221, 228 (D.
Conn. 2017) (citing *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995)); *see United States
v. Drayton*, 536 U.S. 194, 206–07 (2002) ("The Court has rejected in specific terms the
suggestion that police officers must always inform citizens of their right to refuse when seeking
permission to conduct a warrantless consent search."); *Edwards v. Arizona*, 451 U.S. 477, 484
(1981) ("*Schneckloth* . . . thus emphasized that the voluntariness of a consent or an admission on
the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries."); *United
States v. Watson*, 423 U.S. 411, 424 (1976) ("[U]nder *Schneckloth*, the absence of proof that [the
defendant] knew he could withhold his consent, though it may be a factor in the overall
judgment, is not to be given controlling significance."); *United States v. O'Brien*, 926 F.3d 57,
76 (2d Cir. 2019) ("[W]hile knowledge of the right to refuse consent is one factor to be taken
into account, the government need not establish such knowledge as the *sine qua non* of an
effective consent."  (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973))); *United
States v. Clark*, --- F. Supp. 3d ---, ---, 2022 WL 1210478, at *13 (W.D.N.Y. Apr. 25, 2022)
("[T]he government has no affirmative obligation to advise the defendant of his right to refuse
consent to search; rather, that is one factor to be taken into account in determining
voluntariness[.]" (quoting *Schaefer*, 859 F. Supp. 2d at 407)); *United States v. Gomez*, 199 F.
Supp. 3d 728, 745 (S.D.N.Y. 2016) (same), *aff'd*, 751 F. App'x 63 (2d Cir. 2018).

and does not, under the totality of the circumstances, invalidate the voluntariness of her consent. *See United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980) ("Although the Constitution does not require 'proof of knowledge of a right to refuse as the *sine qua non* of an effective consent to a search,' such knowledge was highly relevant to the determination that there had been consent." (citation omitted) (quoting *Schneckloth*, 412 U.S. at 234)); *United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995) (holding that, in view of the totality of the circumstances, the defendant's consent was voluntary because it was "a deal struck between a former experienced police officer and the arresting agent"); *United States v. Boffardi*, 684 F. Supp. 1263, 1268 (S.D.N.Y. 1988) (holding that the defendant's consent was voluntary because, among other things, "the defendant is a former policeman" and "[a]s such, he was well aware of his rights and familiar with the criminal justice system"), *aff'd*, 872 F.2d 1022 (2d Cir. 1989).

Accordingly, Sergeant Giddens voluntarily consented to the search of the blue Nissan, and the Court therefore denies Okon's motion to suppress the fruits of the search. *See United States v. Rico Beltran*, 409 F. App'x 441, 443 (2d Cir. 2011) (holding that the co-defendant's consent to search was voluntary because he "faced no questioning or physical punishment prior to giving consent, . . . was not in custody at the time of consent, and . . . remained calm during his interactions with the agents"); *United States v. Sylla*, No. 08-CR-906, 2010 WL 582575, at *9 (E.D.N.Y. Feb. 16, 2010) (finding that consent to search was voluntary because "there is no evidence to indicate that any of the agents intimated, threatened, deceived, made promises or exhibited more subtle forms of coercion in order to procure [the defendant's] consent"); *United States v. Fuentes*, No. 07-CR-329, 2007 WL 2319142, at *5 (S.D.N.Y. Aug. 10, 2007) (holding that the defendant's consent to search was voluntary because the defendant "was not in custody

when he consented . . . , nor is there any evidence whatsoever in [the] record that he was subjected to threats or displays of force in order to extract that consent").

### c. The Court denies Okon's motion for the immediate production of all exculpatory and impeachment material

Okon moves for an order "granting the immediate disclosure of all material that may be favorable to the accused." (Def.'s Mem. 9.)

The Government argues that because it has no responsive information as to *Brady* materials and Okon is not entitled to *Giglio* information at this stage, the Court should deny the motion. (Gov't Opp'n 14.)

"Under *Brady* and its progeny, 'the [g]overnment has a constitutional duty to disclose favorable evidence to the accused where such evidence is "material" either to guilt or to punishment.'" *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (quoting *United States v. Coppa (In re United States)*, 267 F.3d 132, 139 (2d Cir. 2001)); *United States v. Douglas*, 525 F.3d 225, 244 (2d Cir. 2008) (quoting *Brady*, 373 U.S. at 87); *see also Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006); *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) ("To the extent that [a] prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation [grounded in the 14th Amendment] to disclose that evidence to the defendant." (alterations in original) (quoting *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001))).

Favorable evidence "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "*Giglio* material." *Certified Env't Servs., Inc.*, 753 F.3d at 91 (quoting *Coppa*, 267 F.3d at 139); *see, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *United States v. Brennerman*, 818 F. App'x 25, 29 (2d Cir. 2020) ("The

16

government has an obligation under the Due Process Clause to make a timely disclosure of any exculpatory or impeaching evidence that is material and in its possession." (citing *Brady*, 373 U.S. at 83)); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (stating that the Supreme Court extended the government's *Brady* obligations in *Giglio* "to cover evidence that could be used to impeach a government witness"); *United States v. Djibo*, 730 F. App'x 52, 56 (2d Cir. 2018) (same).

"Although there is no precise deadline for when the government is required to disclose *Brady* and *Giglio* material, [the Second Circuit has] held that *Brady* requires disclosure 'in time for its effective use at trial.'" *Djibo*, 730 F. App'x at 56 (quoting *Douglas*, 525 F.3d at 245); *see also United States v. Campbell*, 850 F. App'x 102, 109 n.4 (2d Cir. 2021) ("It is well settled that 'as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not [committed a *Brady* violation] simply because it did not produce the evidence sooner.'" (alteration in original) (quoting *Coppa*, 267 F.3d at 144)); *United States v. St. Lawrence*, 767 F. App'x 77, 81–82 (2d Cir. 2019) (same); *United States v. Halloran*, 821 F.3d 321, 341 (2d Cir. 2016) (same); *Coppa*, 267 F.3d at 142, 144, 146 (same).

"[T]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence . . . as well as the particular circumstances of the case." *Coppa*, 267 F.3d at 146. "*Brady* information must be disclosed . . . in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial. Thus, the [g]overnment must make disclosures in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *United States v. Frank*, 11 F. Supp. 2d 322, 325 (S.D.N.Y. 1998) ("The [c]ourt has ordered that *Brady* material be disclosed

promptly after it comes to the [g]overnment's attention, inasmuch as the defendant may need to

undertake an investigation to develop and present effectively the exculpatory information.").

"The issue of when *Giglio* material should be disclosed, however, must be analyzed separately,"

*Frank*, 11 F. Supp. 2d at 325, as "[*Giglio*] material ripens into evidentiary material for purposes

of impeachment only if and when the witness testifies at trial," *United States v. Wey*, No. 15-CR-

611, 2017 WL 237651, at *23 (S.D.N.Y. Jan. 18, 2017) (quoting *United States v. Earls*, No. 03-

CR-364, 2004 WL 350725, at *8 (S.D.N.Y. Feb. 25, 2004)).  Accordingly, "there is no

constitutional right to early disclosure of *Giglio* or § 3500 material."  *United States v. Davis*, No.

17-CR-615, 2021 WL 826261, at *3 (E.D.N.Y. Mar. 3, 2021) (quoting *United States v. Minaya*,

No. 11-CR-755, 2012 WL 1711569, at *4 (S.D.N.Y. May 14, 2012)); *Frank*, 11 F. Supp. 2d at

325 (noting that government may "defer[] production" of *Giglio* material "until closer to the time

of the witnesses' testimony" as long as the defendant still has time to use it effectively).

Nevertheless, a court may "order *Brady*/*Giglio* disclosure at any time as a matter of 'sound case

management.'"  *United States v. Taylor*, 17 F. Supp. 3d 162, 177 (E.D.N.Y. 2014) (quoting

*United States v. Nogbou*, No. 07-CR-814, 2007 WL 4165683, at *3–4 (S.D.N.Y. Nov. 19,

2007)).  "Courts in the Second Circuit generally do not compel immediate disclosure of

*Brady*/*Giglio* materials where (1) the Government represents it is aware of and will comply with

its *Brady*/*Giglio* obligations, and (2) the [d]efense does not provide any reason for suspecting the

Government will not comply."  *United States v. Mohamed*, 148 F. Supp. 3d 232, 246 (E.D.N.Y.

2015) (collecting cases); *see also United States v. Rodriguez*, No. 19-CR-779, 2020 WL

5819503, at *10 (S.D.N.Y. Sept. 30, 2020) (stating that "[c]ourts in this Circuit have repeatedly

declined to issue pretrial discovery orders pertaining to *Brady* and *Giglio* material, upon a good

faith representation by the government that it has complied — and will continue to comply —

18

with its disclosure obligations" and collecting cases).

       With respect to *Brady* materials, the Government has represented that it has no responsive information and that it will provide any such materials if it acquires such information. (Gov't Opp'n 14.)  As to *Giglio* materials, Okon has not offered any explanation for why expedited disclosure is necessary to the preparation of his defense or why he suspects that the Government will not comply with its obligations.  (*See* Def.'s Mem. 8–9.)  Accordingly, the Court denies without prejudice Okon's request for immediate disclosure.  *See Mohamed*, 148 F. Supp. 3d at 246 (denying request for immediate production of *Brady*/*Giglio* materials as premature where the government represented it would "provide *Brady*/*Giglio* material . . . four weeks prior to the suppression hearing" and "search for any *Brady*/*Giglio* material that would require earlier disclosure" — indicating that it was "aware of its obligations and [would] comply with such obligations before trial" — and where the defendant "provided no reason for suspecting the [g]overnment [would] fail to comply with its obligations"); *United States v. Rivera*, 89 F. Supp. 3d 376, 396–97 (E.D.N.Y. 2015) (declining to compel early disclosure where government represented it would produce *Brady* materials immediately upon becoming aware of such materials and would produce *Giglio* materials in advance of trial); *United States v. Badoolah*, No. 12-CR-774, 2014 WL 4793787, at *16 (E.D.N.Y. Sept. 25, 2014) (same); *see also United States v. Sezanayev*, No. 17-CR-262, 2018 WL 2324077, at *9 (S.D.N.Y. May 22, 2018) ("The [g]overnment's good faith representations of its continuing compliance with its *Brady* disclosure obligations is sufficient [to satisfy its *Brady* obligations].");  *United States v. Gatto*, 316 F. Supp. 3d 654, 657–60 (S.D.N.Y. 2018) (declining to order immediate disclosure of purported "exculpatory and impeaching witness statements").

**III.  Conclusion**

For the foregoing reasons, the Court denies Okon's motion to suppress the fruits of the search of the blue Nissan Sentra and denies without prejudice Okon's request for immediate production of all impeachment materials.

Dated:  September 9, 2022
        Brooklyn, New York

                                 SO ORDERED:


                                 _____s/ MKB_____
                                 MARGO K. BRODIE
                                 United States District Judge